**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00162-CV**
_____

**BOBBY G. BENNETT JR., Appellant**

**V.**

**LAURA MERRYMAN BENNETT, Appellee**

**On Appeal from the 418th District Court**
**Montgomery County, Texas**
**Trial Cause No. 15-05-04918-CV**

**MEMORANDUM OPINION**

Bobby G. Bennett Jr. (Bobby) and Laura Merryman Bennett (Laura) were married in 1991. In 2015, Laura filed a petition for divorce, and Bobby filed a counter petition for divorce. A jury trial was conducted on the conservatorship of their children, and a bench trial was held on the terms of visitation, child support, and the division of the marital estate. The trial court signed a final decree of divorce and issued findings of fact and conclusions of law. The final decree of divorce stated

1

that, in accordance with the jury verdict and the evidence, the trial court appointed Laura as sole managing conservator and Bobby as possessory conservator of the two children, ordered child support to be paid by Bobby, and made a division of the marital estate. On appeal, Bobby raises four issues challenging only the division of the marital estate. Bobby (1) contends the trial court abused its discretion in not excluding certain testimony from Laura's expert witness about fraud and waste of the community estate; (2) challenges the factual sufficiency of the evidence supporting the trial court's findings of fraud, breach of fiduciary duty, constructive fraud, and waste; (3) asserts the trial court abused its discretion in failing to make a just and right division of the community estate; and (4) argues the trial court abused its discretion by ordering Bobby to pay all attorney's fees.[1]

---

[1] After Bobby's initial appellate attorney filed his appellate brief, and after the Appellee had already filed her brief, on March 6, 2018, Bobby filed a motion for substitution of appellate counsel, and this Court granted the motion. This Court denied Bobby's motion to strike his original brief and to file an amended brief. However, this Court granted Bobby's motion for extension of time to file a supplemental brief and allowed Bobby to raise "one additional issue . . . if new appellant counsel deems [it] necessary." *See* Tex. R. App. P. 38.7. In "Appellant's Supplemental Brief and Reply to Appellee's Brief[,]" Bobby raises a fourth issue as his "new issue" that we address as issue four in this Memorandum Opinion. To the extent Bobby's supplemental brief and reply raises any other "new issues," we do not consider them as those arguments were not raised in his original brief, and the presentation of those new arguments are not on the terms prescribed by this Court's letter. *See* Tex. R. App. P. 38.3; *see also ERC Midstream LLC v. Am. Midstream Partners, LP*, 497 S.W.3d 99, 108 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (refusing to consider appellants' issue because it was a new issue raised in a

2

Evidence from Bench Trial[2]

Buddy Smith, an investigator with Child Protective Services (the "Department"), testified that after the docket call for the jury trial but the week prior to the jury trial beginning, Bobby called in a report to the Department, alleging neglectful supervision by Laura of their two children and Bobby said that Laura had suicidal tendencies. Smith testified that he met with Laura and the two children, the children made no outcries of abuse or neglect against Laura or their home environment, the children did not voice any concerns related to allegations of suicidal tendencies of Laura, Laura denied having suicidal tendencies, and Smith learned that Laura and Bobby were involved in a highly contested divorce and custody dispute that would soon go to trial. Smith's report and his testimony included statements that one of the children reported that Bobby had hit Laura in the

---

supplemental brief after appellee had filed response); *Myan Mgmt. Grp., L.L.C. v. Adam Sparks Family Revocable Trust*, 292 S.W.3d 750, 754 n.1 (Tex. App.—Dallas 2009, no pet.) (reply brief may not be used to raise new issues even to refute a matter raised in an appellee's response).

[2] We restrict our discussion of evidence from the trial to the testimony related to the court's division of the marital estate because all of the complaints articulated by Bobby pertain thereto. The trial court heard the evidence regarding the division of the marital estate during a bench trial and the reporter's record for the bench trial notes that "[t]his record does not include jury trial testimony from 9/12/16 through 9/20/16, per Appellant's Designation of Reporter's Record."

past and that the police had twice been to the residence for welfare checks. According to Smith, he found no concerns with respect to the children. Smith, on behalf of the Department, notified Laura that the Department had investigated the allegations and concluded the alleged abuse or neglect did not occur, and the Department closed the investigation.

Laura testified that she and Bobby were married in 1991 and separated in 2015. According to Laura, she petitioned for a divorce on the grounds of Bobby's cruel treatment toward her and because the marriage had become insupportable. According to Laura, during the pendency of the divorce she and the children were living in Tyler, Texas with her parents. At the time of trial, Laura had access to about $15,000 in her bank account and all other assets were under Bobby's sole management and control. A spreadsheet of Laura's monthly expenses was admitted into evidence. Laura testified that she has a "business degree" from Baylor University, but she has not worked outside the home in over twenty years. Laura testified that at the time of trial she was unemployed and had not applied for a job, but she explained that she was trying to look for employment and was getting certified as a substitute teacher. According to Laura, she would like to buy or rent a home and she estimated that monthly rent or a mortgage payment would cost $2,500 per month.

Laura hired Mike Stocker as her attorney in May of 2015 to represent her in the divorce proceeding. She testified that she was requesting the trial court order the payment of the balance of Stocker's attorney's fees as part of the division of the marital estate. According to Laura, she recently learned that Bobby had prepaid some taxes on The Woodlands residence that Bobby lived in without consulting her. Laura requested that she be awarded The Woodlands residence so that she could sell it and buy a home in Tyler. Laura also testified that she wanted the trial court to award her their vacant lot in Tyler that they own free and clear so that she could sell it and apply the proceeds to a new home. Laura testified that sometime after the jury verdict in the custody case she learned about a Renasant Bank account ending in 7668 on which her husband was a signatory along with his father. Laura also testified that Bobby did not consult with her before he decided to liquidate the children's 529 education accounts and that now the children do not have those funds available for college.

Bobby testified that he is an anesthesiologist and he has been in private practice since 1992. According to Bobby, the family moved to Tyler in 1994 mainly because Laura wanted to live there. Bobby testified that he worked at a hospital in Tyler until 2005, when his physician group was replaced by the hospital. Bobby testified that because the family had just built a million-dollar home in Tyler and

5

Laura would not leave Tyler, Bobby commuted to work in Longview. After six years of commuting, and because of Bobby's strained relationship with administration at the Longview hospital and his desire to work closer to home, Bobby accepted a job in "pain work" in Tyler. Bobby testified that he eventually believed working in Tyler was no longer in his family's best interest and the family moved to The Woodlands where Bobby found employment. According to Bobby, The Woodlands job provided a good income and was a "semiretirement position[]" because he was not required to be on call, and although the job limited his ability to make a lateral transfer to jobs in other cities, he thought he would have more time for his family.

Bobby testified that he knew Laura did not want to move from Tyler, that after the move to The Woodlands Laura became hostile, and that they separated in 2015. Bobby's counter-petition sought a divorce on grounds of irreconcilable differences and Laura's cruel treatment towards Bobby. According to Bobby, he alleged cruel treatment by Laura as grounds for divorce based on Laura's being "very demeaning to [Bobby] [and] very demanding upon [Bobby]" and "discontent, . . . entitled, . . . [and] insulting."

Bobby testified that, as of the time of trial, he was "[d]evasted" financially and the divorce "has cost total nearly $2 million." According to Bobby,

6

[a]ll of my kids' college education money is gone except that money which I've given to Laura's mother that's being used for high school that came from me, not from her mother, and then all of most of my retirement, a good portion of my retirement is gone. All of my emergency savings is gone.

According to Bobby, despite his attempts during the divorce, he has been unable to find comparable employment in Tyler.

Bobby testified that his lawyers instructed him that he could use investment money for case expenses. Bobby believed liquidating the 529 education accounts had the least tax consequences over other investments, and that is why he chose to liquidate the $184,000 in one account in October 2015 and the $157,000 in the other account in April or May of 2016 to pay his attorney's fees and expenses for the case. Bobby testified that in October 2015 he also cashed out a combined $44,000 out of two Uniform Gift to Minors Act accounts that were savings accounts for his children because he wanted "[t]o prevent Laura from potentially getting access to those funds." According to Bobby, he initially kept the funds in the form of a check "for emergency in [his] safe" but later deposited the check into his operating account to pay bills once the trial court ordered all assets frozen and "all [Bobby's] expenses were three and four times" his monthly income. Bobby testified that during the pendency of the divorce he was making $14,865 per month after taxes and paying $6,137 for spouse and child support and court fees, and that his monthly expenses

were close to $23,000 per month. According to Bobby, the only way he could pay the $1.2 million in attorney's fees and expenses for the case without liquidating other retirement sources was to liquidate the 529 accounts, which had the least tax consequence, and withdraw $350,000 out of his IRA, which was profit from the sale of the Tyler home and a non-taxable amount. Bobby testified that he did not try to hide money from Laura and that he believes his spending has been fair and it was allowed by the standing orders. Bobby agreed that on the day of the temporary order hearing, he took out a $200,000 line of credit on the Tyler home and he sent the money in the form of a cashier's check to his mother in Tupelo, Mississippi. He later had his mother mail him the check that he then deposited into his own bank account, and when the Tyler home sold per the court's order, Bobby paid the line of credit off with the proceeds from the sale of the Tyler home. Bobby also testified that he spent money to pay "Vidoc Razor" to try to get access to his wife's phone because the passwords he had would not work.

Stewart Gagnon testified that he is a lawyer and of counsel to the law firm of Norton Rose Fulbright, U.S., L.L.P. and a former partner of the firm. According to Gagnon he has been a licensed practicing attorney since 1974, and he is certified with the Texas Board of Legal Specialization in family law. Gagnon testified he has "written extensively" on "the characterization of marital property in the state of

8

Texas, reimbursement as it relates to marital property in the state of Texas and various elements of reimbursement [such as] reconstitution of the estate that has since become part of our family code[.]" According to Gagnon, he has "written extensively both [for][] the Advanced Family Law Course, the Marriage Dissolution Course, New Frontiers of Marital Property, which [he] ha[s] spoken at several times, as well as several programs at the American Academy of Matrimonial Lawyers." Gagnon testified that he was the chair of the Family Law Section Legislative Committee for eighteen years and appeared before the legislature and lobbied on behalf of the Family Law Section for and against legislation. Gagnon testified that "[o]ne of those legislations was Section 7.009 of the Family Code, which allows the Court, upon a finding of waste, to reconstitute the marital estate in order to divide it appropriately." Gagnon explained he has lectured and written about matters related to breach of fiduciary duty and to various aspects of actual and constructive fraud in family law cases. According to Gagnon, he and two other attorneys wrote a three-volume treatise on Texas marital property law that is published by Reuters and West Publication.

Gagnon testified that the legal definition of "waste" in a family law case is "the unreasonable use by a spouse in a harmful or destructive manner of a marital estate so that it changes or diminishes the value of that estate at a point in time."

9

According to Gagnon, Bobby produced documents after the jury verdict in the custody case that revealed Bobby had an out-of-state Renasant bank account with his father. Bobby had deposited funds from a line of credit into this account and obtained a cashier's check, and the account had not been listed on any of Bobby's prior inventories that Bobby had submitted in the divorce. Gagnon testified that a temporary order agreed to by the parties had been entered on August 20, 2015, and that in the agreed temporary order Bobby agreed to the appointment of Laura as sole managing conservator and that Bobby would have supervised visits with their children. According to Gagnon, for purposes of his testimony regarding Laura's waste claim, Gagnon focused on the time of August 2015 until shortly before trial and that $988,602.86 of Bobby's own litigation-related expenses were paid by Bobby from the community estate during that period. Gagnon testified that he reviewed the trial judge's order in which the judge ordered the parties not to receive or pay any additional fees or pay any additional legal expenses from the community estate. Gagnon testified that based on his review of Bobby's inventories, he concluded that even after the judge's order telling Bobby not to do so, Bobby liquidated the children's 529 accounts and used the funds to pay his own legal fees in violation of the order. Gagnon testified that these actions by Bobby "required additional work on behalf of both parties and additional fees on behalf of both parties

10

[that] led to a subsequent fallback of those funds back into the marital estate at least for a time period[.]"According to Gagnon, the money in the 529 accounts was not Bobby's but was instead money solely in the children's names that was gifted to them. Gagnon also testified that Bobby violated the court's order when he made an August 18, 2016 payment of $10,045 to Dr. Seth Silverman, Bobby's retained expert witness who did not testify at trial.

Gagnon testified that he reviewed documents related to the litigation expenses and Petitioner's Exhibit 81, which he described as an accounting of the litigation and litigation-related expenses involved in the divorce case. Gagnon explained that Petitioner's Exhibit 81 was prepared by Stewart & Hurst, a forensic accounting firm retained by Laura that, among other things, does marital property forensic accounting and tracing for divorce cases. Petitioner's Exhibit 81 listed the total divorce-related payments at $1,226,455.97, as of October 25, 2016. Gagnon testified that, based on his review of Petitioner's Exhibit 81, Bobby had retained and paid more than $5,000 to an ad litem or amicus attorney for the children in the custody case. According to Gagnon, this relates to Laura's waste claim because Bobby had no legal authority to retain and pay an ad litem because (1) under the temporary orders he was not sole managing conservator of the children and lacked the authority to contract or employ people on their behalf and (2) it is only the trial court who can

11

appoint someone to act on behalf of the children as an attorney or ad litem. On direct

examination, Gagnon also testified:

> Q. Are you aware of the witnesses and the cost associated with witnesses subpoenaed by Dr. Bennett for purposes of the jury trial, just the child custody issues?
>
> A. Well, my understanding is he subpoenaed a significant number of witnesses including a lot of witnesses well outside the subpoena range of this court and then withdrew those subpoenas.
>
> Q. Are you aware of the cost, the expenditure by the community estate for the issuing of those subpoenas?
>
> A. I have seen those subpoenas.
>
> . . . .
>
> Q. . . . [L]ook at Petitioner's Exhibit 81[.]
>
> A. Okay. I have it.
>
> Q. . . . Items 1 through 39 . . . what if anything is waste and/or attorney fees issues, in your opinion?
>
> . . . .
>
> A. Again, after August -- end of August of 2015, Dr. Bennet's continued insistence regarding the custody of his children caused additional fees to be incurred on behalf of both Ms. Bennett and the marital estate. For example, Kit Harrison was paid $8,000.00 on September 9th. If Dr. Bennett had not pursued unreasonably that custody determination all the way through a jury trial where he didn't testify, those expenses for Dr. Harrison would not have been necessary.
>
> Q. . . . Line items 40 through and including 79.

12

A. . . . There is $10,000 to Ruth Vernier. $10,000 to Seth Silverman, who was engaged by Dr. Bennett as an expert witness but then never until on the eve of trial provided any disclosure under Rule 194 as to his opinions or conclusions or what he had considered and then never testified.

Q. Was Dr. Seth Silverman a retained expert?

A. Yes. In fact, it was noted as such.

Q. All right. The disclosure you just mentioned, that came literally, like, within a few days of the . . . jury selection, didn't it?

A. That's correct.

Q. Well after the August 18th[] discovery cutoff for purposes of the trial?

A. That is exactly right.

Q. So did Dr. Seth Silverman add anything to this case?

A. No. But again, that was a habit of Dr. Bennett of designating expert witnesses and then never even using them or engaging in a lot of money and never using them, and there was no benefit to the community estate for that.

For example, Dr. Bennett designated somebody to do tracing and testify as to characterization of separate property, which the only separate property ever listed on any of the documents he provided was a few items of personal property that were not contested and a $200,000.00 cashier check that was apparently in the possession of his mother at one time and all of a sudden dropped off his inventory. There was no need to designate an expert witness with that type of testimony and engage -- incur the expenses for that type of testimony when that person -- there is no issue regarding separate property.

. . . .

13

Q. Line 66. Would you look at that?

A. There [are] Claudia Canales expenses, which is Line 55. Obviously, her expenses after August 31st wouldn't be necessary if Dr. Bennett wasn't unreasonably pursuing a sole managing conservatorship custody case. You asked me about 66? --

Q. Yes.

A. -- Laura Marburger, that's $5,000.00 we talked about earlier.

Q. All right.

A. Additional Claudia Canales expenses. There is Pathway Forensics. There was Jed Moffett's fee of $20,000.00 where Dr. Bennett apparently -- and it's obvious from the record that he changed lawyers several times, from Mr. Jackson to Ms. Vernier to Mr. Moffett to Mr. Jackson to Ms. Vernier to Mr. Jackson again. I mean, all of that behavior, all of that action unreasonably cost without any benefit to this community estate, diminishes that estate.

Gagnon stated that several payments by Bobby were made to his lawyers, and according to Gagnon, changing lawyers as often as Bobby did drastically increased the legal fees as each new attorney had to "recreate the wheel and that's an unreasonable expense, especially when you are bouncing between the same lawyers back and forth." According to Gagnon, Bobby also paid $10,000 to a private investigator to record Laura's actions and activities. Gagnon also testified about line 155 on Petitioner's Exhibit 81 which reflected a payment made to "Vidoc Razor, L.L.C." which is a computer forensics company. According to Gagnon, the person associated with the Vidoc Razor company was not designated to testify and the

14

payment was made in violation of the court's order. Gagnon also opined that these payments along with other litigation-related expenses constituted waste.

Gagnon reviewed Bennett's 2013, 2014, and 2015 tax returns that cumulatively resulted in a tax overpayment of $62,250 which Gagnon stated should be a refund available to the taxpayer, but Bobby did not list the refund on Bobby's inventory. Gagnon noted in his testimony that Bobby prepaid with community funds the 2016 property and school taxes on The Woodlands residence, and the amount that he prepaid was also never disclosed on Bobby's inventories. Gagnon explained that "any of these prepayments to the IRS[,] to the tax appraisal districts or anything like that of anything that is not due right now is a prepayment for his benefit and should have been reflected as an asset on his inventory and not doing that caused [Laura's counsel] to do additional work and . . . hides assets that are not disclosed by him."

Raymond Blevins, a certified public accountant and the Bennetts' CPA prior to the divorce, testified that the income tax liability for the Bennetts was $26,873 in 2013, $3,397 in 2014, and $41,421 for 2015. According to Blevins, approximately $20,000 of the $41,421 tax liability was attributable to the sale of the $184,000 529 plan. Blevins testified that there was an overpayment of $37,841 from 2015 to 2016 and that approximately $62,500, in addition to the $37,841 had been prepaid by

15

Bobby to the IRS for 2016. Blevins testified that there will be at least a $15,000 to $18,000 tax liability for the $157,000 529 plan that was cashed out by Bobby, and that the approximate total tax liability for 2016 will be $35,000 to $40,000 including the penalty for the 529 plan. According to Blevins, based on estimated tax liability for 2016 and amounts already paid, the Bennetts should have an overpayment and refund of approximately $60,000. Blevins also testified that Bobby always wanted the least money going out for taxes so he could keep the bills paid, and that if he had wanted to try to harm the community estate then he could have taken other accounts that could have created a greater tax burden.

Trial Court's Findings

In dividing the marital estate, the trial court awarded the following assets to Bobby and Laura, respectively, and listed values for the assets in the trial court's written Findings of Facts and Conclusions of Law[3]:

| Property Awarded to Bobby | Value |
|---|---|
| Residential house in The Woodlands | $890,560.00 |
| Bank account ending in 932 | $1,897.23 |
| Bank account ending in 4772 | $49,825.89 |
| Retirement account ending in 8619 | $0.04 |
| Retirement account ending in 0706 | $325,949.54 |
| 2012 Honda Ridgeline | $27,396.00 |

---

[3] The parties stipulated that all other personal property would be divided in arbitration and would not be a part of the marital estate divided by the trial court.

| | |
|---|---|
| Tyler Anesthesia Services d/b/a Bennett Enterprises, PA, which includes Bank account ending in 8696 | $25,595.45 |
| BGB Management Company, LLC, which includes the BankCorp South money market account ending in 4883 | $5,620.17 |
| Family Partnership | $0.00 |

| Property Awarded to Laura | Value |
|---|---|
| Vacant lot in Tyler, Smith County, Texas | $125,000.00 |
| Bank account ending in 3384 in Petitioner's name | $12,000.00 |
| Portion of bank account ending in 4772 in name of Respondent | $50,000.00 |
| Retirement account ending in 8934 | $190,892.89 |
| Retirement account ending in 8933 | $55,168.65 |
| Retirement account ending in 7267 | $192,428.39 |
| Retirement account ending in 0996 | $434,391.31 |
| Annuity | $106,983.46 |
| Annuity | $59,083.25 |
| 2008 Toyota Sequoia | $11,340.00 |
| 2007 Honda Ridgeline | $4,345.00 |

The trial court also included the following findings of fact, in pertinent part:

> [] The Court finds that Respondent, Bobby G. Bennett, Jr., is guilty of cruel treatment toward Petitioner, Laura Merryman Bennett, of a nature that renders further living together insupportable.

> . . .

> [] The Court finds that Bobby G. Bennett, Jr. is awarded any and all claims against his mother, which would include, but not be limited to the two distributions he made to her in the amounts of $97,507.48 and $20,346.19. The Court further finds that Bobby G. Bennett, Jr. wasted community assets in the total amount of $19,045.00 (See Petitioner's Exhibit 81, lines 155 and 173).

17

. . .

[] The Court finds that Laura Merryman Bennett and Bobby G. Bennett, Jr. are each awarded the Holly Tree Country Club courtesy membership in his or her own name.

[] The Court finds that Laura Merryman Bennett and Bobby G. Bennett, Jr. should be ordered to file a joint married return for the tax year 2016.

[] The Court finds that the parties shall not be allowed to carry forward or rollover any 2016 prepaid taxes to 2017.

[] The Court finds that Bobby G. Bennett, Jr. shall be responsible for all the costs of Ray Blevins, CPA to prepare the parties' 2016 tax return.

[] The Court finds that Laura Merryman Bennett shall be awarded 62% of the parties' 2016 tax refund and Bobby G. Bennett, Jr. shall be awarded 38% of that refund.

[] The Court finds that should there be any tax liability for tax year 2016, Bobby G. Bennett, Jr. shall be 100% responsible for that liability.

. . . .

[] The Court finds that attorney's fees as a judgment in the amount of $350,000.00 should be awarded to Petitioner as part of the just and right division of the marital estate.

. . . .

[] The Court finds that there is an outstanding balance owed to Claudia Canales, the Amicus attorney, in the amount of $8,974.31, which amount is ordered to be paid by Bobby G. Bennett, Jr. at or before entry of the Final Decree of Divorce. . . .

. . . .

18

[] The Court finds that the following are liabilities of the community estate and are ordered to be paid by Bobby G. Bennett, Jr.

(a) Mortgage owed on [The Woodlands residence]: $706,888.24.

. . . .

[] The Court took into consideration the following factors in making a determination of a disproportionate division, which is a just and right division of the parties' marital estate:
(a) fault in the breakup of the marriage by Bobby G. Bennett[, Jr.];
(b) ages of the spouses;
(c) the length of the marriage of the parties;
(d) breach of fiduciary duty by Bobby G. Bennett, Jr.;
(e) fraud on the community by Bobby G. Bennett, Jr.;
(f) constructive fraud by Bobby G. Bennett, Jr.;
(g) benefits the innocent spouse may have derived from the continuation of the marriage;
(h) disparity of earning power of the spouses and their ability to support themselves;
(i) education and future employability of the spouses:
(j) community indebtedness and liabilities;
(k) the spouse to whom conservatorship of the children is granted;
(l) needs of the children of the marriage;
(m) tax consequences of the division of property;
(n) earning power, business opportunities, capacities, and abilities of the spouses;
(o) need for future support for Laura Merryman Bennett;
(p) nature of the property involved in the division;
(q) wasting of community assets by Bobby G. Bennett, Jr.;
(r) attorney's and expert fees and expenses paid and to be paid; and
(s) the size and nature of the separate estates of the spouses.

The trial court also stated in its conclusions of law that it granted the divorce in favor of Laura "on the ground of cruelty by Bobby G. Bennett, Jr. toward Laura Merryman Bennett that renders further living together insupportable."

19

Expert Testimony

In his first issue, Bobby argues the trial court erred in admitting the expert testimony of Stewart Gagnon on waste, fraud, and reconstitution of the community. According to Bobby, Gagnon was not qualified to give the opinion, his opinion was not reliable, and "the pleading relied up[]on w[as] filed out[]side of time permitted by the scheduling order."

We first address Bobby's complaint about the alleged untimely-filed pleading. In his statement of facts in his initial appellate brief, Bobby mentions that Laura's Second Amended Petition for Divorce filed August 18, 2016 was filed "less than thirty days before trial and clearly outside the Court Ordered Deadline[,]" and he argues the Second Amended Petition was the first time Laura had included fraud, waste, and a request for reconstitution. According to Bobby's statement of facts, the trial court sua sponte granted leave for the amended pleadings "with no discussion about harm or surprise." However, Bobby provides no argument, authority, or discussion as to why Gagnon's testimony should have been excluded as it relates to the amended pleading being untimely filed. Bobby has waived that point of error due to inadequate briefing. *See* Tex. R. App. P. 38.1(i); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284-85 (Tex. 1994) ("error may be waived by inadequate briefing[]").

As to Gagnon's testimony, on appeal Bobby argues that Gagnon is not a forensic accountant, his opinions are not reliable under the *Robinson* factors, his opinions were nothing more than a personal subjective interpretation of litigation strategy and expenses, and he did not state a methodology or standard criteria in determining his opinion. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. Tex. R. Evid. 702. Testimony, in the form of an opinion or inference otherwise admissible, is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Tex. R. Evid. 704. "Expert testimony is admissible if (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006).

A trial court's decision to accept or exclude expert testimony is reviewed under an abuse-of-discretion standard. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718-19, 727 (Tex. 1998). To testify as an expert, a witness must be qualified in a particular area or field of expertise. *Id.* at 718 & n.9. The determination of whether a witness is qualified as an expert is a preliminary question to be decided

21

by the trial court. *Id.* at 718. The party offering the expert testimony bears the burden to prove the witness is qualified under Rule 702. *Id*.

In *E.I. du Pont de Nemours and Company v. Robinson*, the Texas Supreme Court established that an expert's "underlying scientific technique or principle must be reliable." 923 S.W.2d 549, 557 (Tex. 1995). It identified six factors that courts may consider when determining whether an expert's scientific testimony is reliable and thus admissible. *See id.* The factors are: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Id.* The Texas Supreme Court has clarified that the six factors are nonexclusive and "do not fit every scenario." *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 235 (Tex. 2010); *see Gammill*, 972 S.W.2d at 726. Where, as here, an expert relies on principles and analysis rather than on a particular methodology to reach a conclusion, we must assess reliability by determining whether there is "simply too great an analytical gap between the data and the opinion proffered[]" for the opinion to be reliable. *Gammill*, 972 S.W.2d at 726 (quoting *Gen. Elec. Co. v.*

22

*Joiner*, 522 U.S. 136, 146 (1997)). In determining whether there is too great an analytical gap, we look to the facts the expert relied on, the facts in the record, and the expert's ultimate opinion. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015). The Texas Supreme Court has elaborated that analytical gaps "may include circumstances in which the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached." *Id.* (internal citations omitted).

At trial, Bobby's counsel made a *Daubert* challenge, and objected to Gagnon's opinion testimony under Rules 702, 703, and 705 of the Texas Rules of Evidence on the basis that Gagnon is not a forensic accountant and, therefore, not an expert witness who can opine as to fraud and waste by reviewing financial documents. Bobby did not argue that whether waste or fraud or reconstitution existed would be ultimately a legal question for the trial judge to decide, nor did he argue that Gagnon was attempting to testify on pure legal questions.[4] Prior to denying the

---

[4] An expert may state an opinion on a mixed question of law and fact if the opinion is limited to the relevant issues and is based on proper legal concepts. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 619-20 (Tex. 1999). An issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard. *Mega Child Care, Inc. v. Texas Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 309 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Expert testimony on a

*Daubert* challenge, the trial court responded to Bobby's counsel by stating, "I'll let you explore that with him on your cross and if you convince me, then I will not consider his opinions."

Regarding his qualifications to give an expert opinion on fraud, waste, and reconstitution, Gagnon testified that he has written extensively on the characterization of marital property in the state of Texas, lectured and written for family law courses on matters such as breach of fiduciary duty and fraud in family

---

mixed question of law and fact must meet the requirements applicable to expert testimony generally which means it must be helpful to the trier of fact as required by Texas Rule of Evidence 702. *Louder v. De Leon*, 754 S.W.2d 148, 149 (Tex. 1988) (per curiam); *Lyondell Petrochemical Co. v. Fluor Daniel, Inc.*, 888 S.W.2d 547, 554 (Tex. App.—Houston [1st Dist.] 1994, writ denied). An expert, however, may not testify on pure questions of law. *Mega Child Care, Inc.*, 29 S.W.3d at 309. An expert is not allowed to testify directly as to his understanding of the law but may apply legal terms to his understanding of the factual matters in issue. *Welder v. Welder*, 794 S.W.2d 420, 433 (Tex. App.—Corpus Christi 1990, no writ). Based upon the record before us, the trial court could have reasonably concluded that the challenged testimony included mixed questions of facts and no more than the expert's understanding of the law as applied to such facts. Even if we had found that it was error for the trial court to admit the testimony of Gagnon, to reverse a judgment based on error in the admission or exclusion of evidence, we must then also determine the error probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1; *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). Error regarding evidentiary rulings is usually not reversible unless the judgment turns on the particular excluded or admitted evidence. *Port Terminal R.R. Ass'n v. Richardson*, 808 S.W.2d 501, 510 (Tex. App.—Houston [14th Dist.] 1991, writ denied).

law cases, assisted with writing a treatise on Texas marital property law, was the chair of the Family Law Section Legislative Committee for eighteen years, and testified before the legislature and lobbied regarding legislation such as section 7.009 of the Family Code that allows for reconstitution of the marital estate upon a finding of waste. Based on the evidence in the record, we cannot say the trial court abused its discretion in allowing Gagnon to testify or in considering his testimony as an expert.

Gagnon provided his opinion on whether and to what degree Bobby committed waste of the marital estate, and his analysis was based on evidence in the record, including documents formulated by a forensic accounting firm and other documents admitted as exhibits at trial. *See* Tex. R. Evid. 401, 402, 702; *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 729 (Tex. 2003) (expert opinion must be supported by the facts in record). Bobby did not call an expert to contradict Gagnon's testimony or conclusions, nor did Bobby dispute the accuracy of the underlying documents. Having reviewed the entire record, we conclude there is not too great of an analytical gap between the data and the opinion proffered, nor do we see any indication that Gagnon's opinions were based on an unreliable application of otherwise sound principles and methodologies, on assumed facts that varied

25

materially from the facts in the record, or on data that did not support the conclusions reached. *See Gharda USA, Inc.*, 464 S.W.3d at 349. We overrule issue one.[5]

### Fraud, Constructive Fraud, and Waste, Attorney's Fees, and Division of the Community Estate

In issue two, Bobby challenges the factual sufficiency of the evidence supporting the trial court's findings "on fraud, constructive fraud[,] and waste to justify reconstitution division of assets" resulting in a disproportionate distribution of the community estate in favor of Laura.[6] In issue three, Bobby argues the trial court abused its discretion in not making a "just and right" division of the marital property because the division was disproportionate.[7] In issue four, Bobby argues the

---

[5] Although we have concluded that the trial court did not err in overruling Bobby's objections and in admitting the Gagnon testimony, even if the trial court erred in the admission of such testimony, we cannot say that the admission of such testimony probably resulted in an improper judgment. *See* Tex. R. App. P. 44.1(a)(1).

[6] As to Bobby's statement in the summary of his argument for issue two that the trial court could not find fraud, breach of fiduciary duty, and constructive fraud as a matter of law "because the activity occurred during the l[iti]gation and spouses do not owe a fiduciary duty to the other spouse once divorce action begins[,]" Bobby provides no argument or authority in support of his contention. *See* Tex. R. App. P. 38.1(i).

[7] Bobby asserts in his supplemental brief that the trial court awarded Laura 80.86 percent of the community property estate and Bobby was awarded 19.14 percent. He states that these percentages are a correction to his prior assertion in his initial brief that Laura was awarded more than 99 percent of the community property

trial court, by ordering Bobby to pay all attorney's fees, created a division of the community estate that was so disproportionate that it constituted an abuse of discretion. We address issues two, three, and four together as all three issues relate to the trial court's division of the marital estate and Bobby's contention that the trial court erred in failing to make a "just and right" division.

Under section 7.001 of the Texas Family Code, in a divorce case, the trial court must divide the estate of the parties in a "just and right[]" manner. Tex. Fam. Code Ann. § 7.001 (West 2006). Trial courts may exercise wide discretion in ordering a property division. *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998); *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981); *Ohendalski v. Ohendalski*, 203 S.W.3d 910, 914 (Tex. App.—Beaumont 2006, no pet.). Thus, we review property-division issues for abuse of discretion. *Murff*, 615 S.W.2d at 698. A trial court abuses its discretion when it acts arbitrarily or unreasonably, and without reference to any guiding rules or principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

In *Bradshaw v. Bradshaw*, the Texas Supreme Court explained "just and right" as follows:

and he was awarded less than 1 percent. For purposes of the resolution of the appeal we need not determine the percentages.

27

The division of a community estate in divorce must be "just and right, having due regard for the rights of each party and any children of the marriage." "Just" and "right" are broad terms. *Black's Law Dictionary* defines "just" as "[l]egally right; lawful; equitable", and "right" as "[t]hat which is proper under law, morality, or ethics". And "due regard" simply means the "[a]ttention, care, or consideration" that is "[j]ust, proper, regular, and reasonable". A trial court should consider many factors, including "the spouses' capacities and abilities . . . and the nature of the property." The court may consider the "fault in breaking up the marriage", though the community-property division "should not be a punishment for the spouse at fault." In the end, "the court is to do complete equity as between the husband and wife and the children, having due regard to all obligations of the spouses and to the probable future necessities of all concerned."

Because the standards for dividing a community estate involve the exercise of sound judgment, a trial court must be accorded much discretion in its decision. The division "should be corrected on appeal only where an abuse of discretion is shown in that the disposition made of some property is manifestly unjust and unfair." The appellate court cannot merely reweigh the evidence. Rather, "[a] determination of whether the property division decreed in a divorce constitutes an abuse of discretion presents a legal rather than a factual question for appellate review." And in deciding that legal question, the trial court is entitled to no deference. "[A] trial court has no discretion in determining what the law is or applying the law to the facts, even when the law is unsettled."

555 S.W.3d 539, 543 (Tex. 2018) (internal citations omitted).

A trial court's division of property need not be equal, and we presume the trial court properly exercised discretion in determining the value and division of marital property. *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974). A trial court may award an unequal division of marital property when a reasonable basis exists for doing so.

28

*Loaiza v. Loaiza*, 130 S.W.3d 894, 899 (Tex. App.—Fort Worth 2004, no pet.). "Legal and factual sufficiency are relevant factors, rather than independent bases for reversal, in determining whether the trial court abused its discretion." *Aduli v. Aduli*, 368 S.W.3d 805, 819 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "The party attacking the property division bears the heavy burden of showing that the trial court's property division was not just and right." *Pletcher v. Goetz*, 9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied). In reviewing the division of a marital estate, the appellate court should not substitute its own discretion for that of the trial court. *See McKnight v. McKnight*, 543 S.W.2d 863, 866 (Tex. 1976). An abuse of discretion requires something more than an appellate court determining that the trial court should have reached a different result. *Nath v. Tex. Children's Hosp.,* 446 S.W.3d 355, 371 (Tex. 2014). We engage in a two-pronged analysis in deciding whether the trial court abused its discretion: first, we consider whether the trial court had sufficient evidence upon which to exercise its discretion; and, second, we consider whether the trial court erred in its application of that discretion. *Cantu v. Cantu*, 556 S.W.3d 420, 426 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

In exercising its discretion to divide the marital estate, the trial court may consider several factors, including each party's earning capacity, abilities, education, business opportunities, physical health, financial condition, age, and size of separate

29

estates, as well as any future needs for support, custody of any children, reimbursements, gifts to a spouse during marriage, fault in the breakup of the marriage, length of the marriage, and a spouse's dissipation of the estate. *Murff*, 615 S.W.2d at 699; *Hailey v. Hailey*, 176 S.W.3d 374, 380 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *Vannerson v. Vannerson*, 857 S.W.2d 659, 669 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *Baccus v. Baccus*, 808 S.W.2d 694, 700 (Tex. App.—Beaumont 1991, no writ) When one spouse not only deprives the other of community assets but does so with dishonesty and an intent to deceive, the trial court may consider such heightened culpability in its division. *Schleuter*, 975 S.W.2d at 589-90.

The circumstances of each marriage dictate what factors should be considered in division of the marital estate. *Young v. Young*, 609 S.W.2d 758, 761 (Tex. 1980). Because the trial court has "the opportunity to observe the parties on the witness stand, determine their credibility, evaluate their needs and potentials, both social and economic[,]" we defer to the trial court on factual resolutions and credibility determinations. *See Murff*, 615 S.W.2d at 700; *Allen v. Allen*, 475 S.W.3d 453, 458 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Although the trial court may consider fault in the breakup of the marriage, a just and right division should not be punitive against the errant spouse. *Young*, 609 S.W.2d at 762.

Appellant complains that the percentage awarded to the wife amounts to 80.86 percent. As noted by the concurring opinion in *Bradshaw*, there is no set threshold of percentages allowed or disallowed under either the Texas Family Code or under our jurisprudence. 555 S.W.3d at 546 (Devine, J., concurring). Accordingly, even if the percentage of the marital estate awarded to the Appellee may have been 80.86 percent as alleged by Appellant, this Court and other appellate courts have previously affirmed divisions where one spouse received more than 80 percent of the property. *See, e.g.*, *Ohendalski,* 203 S.W.3d at 912 (affirming award of 81 percent of the community estate to wife); *Wright v. Wright,* 65 S.W.3d 715, 716 (Tex. App. — Eastland 2001, no pet.) (affirming award of 88 percent of the community estate to wife). The Family Code "simply instructs that the property division be just and right . . . [and] [i]f the evidence supports a disproportionate division of the marital estate, a trial court must order a division that is just and right, guided by that evidence." Bradshaw, 555 S.W.3d at 547 (Devine, J., concurring).

A fiduciary duty exists between a husband and wife regarding the community property controlled by each spouse. *Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no writ) (op. on reh'g); *In re Marriage of Moore*, 890 S.W.2d 821, 827 (Tex. App.—Amarillo 1994, no writ). "Fraud on the community" is a judicially created concept based on the theory of constructive fraud

31

and is applied when there is a breach of legal or equitable duty, which violates this fiduciary relationship existing between spouses. *Zieba*, 928 S.W.2d at 789; *Moore*, 890 S.W.2d at 827. Such conduct in the marital relationship is termed fraud on the community because it has all the consequences and legal effects of actual fraud since the conduct tends to deceive the other spouse or violates marital confidences. *Wheeling v. Wheeling*, 546 S.W.3d 216, 225 (Tex. App.—El Paso 2017, no pet.) (citing *Zieba*, 928 S.W.2d at 789); *Moore*, 890 S.W.2d at 827. A presumption of constructive fraud arises where one spouse breaches the fiduciary duty owed to the other spouse and disposes of the other spouse's one-half interest in community property without the other's knowledge or consent. *Zieba*, 928 S.W.2d at 789; *Jackson v. Smith*, 703 S.W.2d 791, 795 (Tex. App.—Dallas 1985, no writ). When that occurs, the burden of proof is on the disposing spouse to show fairness in disposing of the community assets. *Zieba*, 928 S.W.2d at 789.

Attorney's fee awards in divorce cases are also reviewed for an abuse of discretion. *Murff*, 615 S.W.2d at 699 (citing *Carle v. Carle*, 234 S.W.2d 1002, 1005 (Tex. 1950)). A trial court may apportion attorney's fees in a divorce action as part of a "just and right" division of the community estate. *See Ayala v. Ayala*, 387 S.W.3d 721, 733 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Vazquez v. Vazquez*, 292 S.W.3d 80, 86 (Tex. App.—Houston [14th Dist.] 2007, no pet.)). "The

reasonableness of the fee awarded is a question of fact that must be supported by the evidence." *Id.* (citing *Vazquez*, 292 S.W.3d at 86). A trial court abuses its discretion in awarding attorney's fees if the resulting division is "manifestly unfair." *Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980).

In his second issue, Bobby argues that, once Gagnon's expert opinion is excluded, the remaining evidence is insufficient to support findings of breach of fiduciary duty, fraud on the community, and wasting of community assets. The trial court specifically found that Bobby wasted community assets in the total amount of $19,045. The trial court could have concluded, even without the testimony of Gagnon, and simply from the exhibits and testimony provided by Laura and developed on cross-examination of Bobby, that Bobby made payments in violation of the trial court's order and made tax overpayments on The Woodlands home and on his income taxes that constituted waste. The amount of those transactions alone, without consideration of the other hundreds of thousands of dollars of alleged waste testified to by Gagnon, exceeds the amount of $19,045 found by the trial court. *See Wheeling*, 546 S.W.3d at 225 (stating that a waste finding can be supported by evidence that spouse used excessive funds without the other spouse's consent). Furthermore, the trial court could have concluded, even without the testimony of Gagnon, and solely from exhibits and Bobby's and Laura's testimony, that Bobby's

actions during the pendency of the divorce resulted in excessive attorney's fees constituting waste in an amount exceeding $19,045. *See id.* We conclude the trial court did not err in finding that Bobby breached his fiduciary duty, perpetrated fraud on the community, and wasted community assets. Even if we were to have reached a different conclusion with respect to the admission of Gagnon's testimony or as to the sufficiency of the remainder of the evidence, Bobby has the burden to also demonstrate that the alleged error caused the trial court to abuse its discretion in the overall division of the community estate, essentially showing that the error was harmful. *See id.* at 227. Bobby has failed to meet his burden.

In this appeal, Bobby does not challenge the trial court's findings or conclusions that Bobby was guilty of cruel treatment towards Laura of a nature that rendered living together insupportable. Grounds for a fault-based divorce include cruelty. *See* Tex. Fam. Code Ann. § 6.002 (West 2006) ("The court may grant a divorce in favor of one spouse if the other spouse is guilty of cruel treatment toward the complaining spouse of a nature that renders further living together insupportable."). We note that the trial court may have also considered that factor, along with others, in making a disproportionate division of property. *See Ohendalski*, 203 S.W.3d at 914-15.

34

Furthermore, the jury determined that Laura should be appointed sole managing conservator of the children and in its findings the trial court listed one of the factors it considered in making a just and right division of the community property as "the spouse to whom conservatorship of the children is granted[]" and the needs of the children. The trial court also stated it considered the length of the marriage as a factor in dividing the community estate. The trial court heard evidence of Laura's and Bobby's education, income, and earning power, and the trial court in its findings listed disparity of earning power of the spouses, Laura's and Bobby's ability to support themselves, a need for future support for Laura, and future employability of the spouses as factors the court considered in making a just and right division of the community property. The trial court heard testimony and received evidence of waste by Bobby, and the trial court listed waste as a factor it considered in dividing the community estate. The trial court also heard evidence that Bobby made overpayments of property and income tax without Laura's knowledge, failed to list certain assets on his inventories, and made payments after entry of the trial court's orders instructing the parties not to do so. Therefore, on the record before us, we conclude that the trial court could have reasonably determined that Bobby committed waste, fraud, constructive fraud, or a breach of fiduciary duty as to the community estate. The trial court also stated in its findings that in dividing the

35

community estate it considered the attorney's fee paid and to be paid. The record shows the parties presented evidence of fees incurred and paid, and the trial court could have also considered whether those fees were reasonable and necessary, and whether the conduct of the parties unnecessarily increased such fees.

We cannot conclude that the trial court acted arbitrarily or unreasonably and without reference to any guiding principles in dividing the estate. *Worford*, 801 S.W.2d at 109; *Hailey*, 176 S.W.3d at 380. We cannot say the resulting distribution was manifestly unfair. After considering the entire record and giving deference to the trial court's factual and credibility determinations, we conclude that the trial court had sufficient evidence upon which to exercise its discretion and that the trial court did not err in its application of that discretion. The trial court had a reasonable basis for awarding a disproportionate distribution and the trial court's division was not so unjust and unfair as to be an abuse of discretion. We overrule issues two, three, and four. We affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on February 19, 2019
Opinion Delivered May 2, 2019

Before McKeithen, C.J., Kreger and Johnson, JJ.